THOMAS J. GILCHRIST, t/a BABY SERVICE CENTER AND STROLL-O-CHAIR, INC., PETITIONERS-APPELLANTS, v. DIVISION OF EMPLOYMENT SECURITY, DEPARTMENT OF LABOR & INDUSTRY, STATE OF NEW JERSEY, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued December 9, 1957—Decided December 20, 1957.

148

Before Judges GOLDMANN, FREUND and CONFORD.

*Mr. Mathias D. Dileo* argued the cause for appellant (*Messrs. Wilentz, Goldman, Spitzer & Sills,* attorneys; *Mr. Dileo,* of counsel).

*Mr. Herman D. Ringle* argued the cause for respondent.

The opinion of the court was delivered by

GOLDMANN, S. J. A. D. The Director of the Division of Employment Security, Department of Labor and Industry, held that Thomas J. Gilchrist, t/a Baby Service Center, on November 2, 1952, effective January 1, 1952, became an employer subject to the Unemployment Compensation Act, under *N. J. S. A.* 43:21–19(*h*)(1), and that Stroll-O-Chair, Inc., became such an employer on April 5, 1954, effective that date, under *N. J. S. A.* 43:21–19(*b*)(2). This decision having been affirmed by the Acting Commissioner of Labor and Industry, petitioners appeal to this court. Stroll-O-Chair concedes that it acquired the organization and business of Gilchrist on April 5, 1954, and that if the latter was a subject employer at that time, it too is subject under *N. J. S. A.* 43:21–19(*h*)(2).

The salient facts have been stipulated in an agreed statement presented by the parties in lieu of record on appeal. *R. R.* 4:88-8.

Gilchrist was the New Jersey distributor for a special type of baby furniture, a combination stroller and highchair, manufactured by Stroll-O-Chair Corp., of New York, and known and advertised as "Stroll-O-Chair." He operated individually as Baby Service Center from February 1950 until April 5, 1954, with his place of business in Ridgefield, N. J., employing a bookkeeper and a deliveryman, and effecting sales through six or seven salesmen. On April 5, 1954 he formed Stroll-O-Chair, Inc., which took over his organization, assets and business. The company operated in the same manner as Gilchrist, and with the same salesmen. (Reference hereinafter to "petitioner" will mean either Gilchrist or the successor company.)

Petitioner gave the salesmen a suggested price ($114.95) at which the Stroll-O-Chair should be sold. However, many of the men did not hold to that price, but gave customers discounts in order to effect sales. Petitioner did not object to such price reduction, since it did not affect the amount payable to it, but merely reduced the salesman's commission (about $30). Petitioner made delivery on each order and collected the balance due in cash or check.

Salesmen had specific territories assigned them. These were protected under a gentleman's agreement, but the men sometimes sold outside their territory. Sales were recorded in triplicate on serially numbered order forms, purchased by the salesmen from petitioner at 25¢ a pad. One copy of the form was delivered to the customer, another to petitioner, and the third retained by the salesman, whose name was printed or stamped above the words "Authorized Dealer for [petitioner's name]" appearing at the top. Near the bottom of the form there was printed "For further information concerning delivery communicate with [petitioner's name, address and telephone number]." In making a sale the salesman would try to collect his commission by way of downpayment from the customer. If any part of the

balance thereafter paid by the customer to petitioner represented commission, that money would be paid to the salesman when his account was settled at the end of the month.

Deliveries were made by petitioner direct to the customer and the cost charged to him. Occasionally the salesman himself delivered the baby chair. If any question arose regarding delivery, the customer was required to communicate with petitioner, but if it concerned defective merchandise, he was to get in touch with the salesman. In case of a customer's default, the downpayment was retained by the salesman and petitioner was left to collect the balance due in whatever way it could.

It is further stipulated that salesmen used their own cars and received no reimbursement for automobile expense. They did not perform services at the central office; they were furnished no tools, secretarial service, telephone service, printed materials or office space, nor were they paid salaries. Salesmen had to secure and pay for any required mercantile or solicitor's license.

The men usually operated from their homes. They had no separate business establishments, offices or special equipment. Their cars carried no commercial registration. The salesmen had no business telephone listing or business stationery. They were not required to work any set hours or days. The men reported to the central office about once a month to settle their accounts. From time to time there were salesmen's meetings at the office to discuss price changes or other business matters.

The only source of income of the salesmen was from handling petitioner's Stroll-O-Chairs, although they tried, on occasion, to supplement this with some other form of work. However, these activities lasted for only short periods of time. One salesman testified that he sold Stroll-O-Chairs for 5½ years and, prior to that, a chair known as "Wonder Chair." Another salesman sold Stroll-O-Chairs for a period of six or seven years and, before that, the "Baby Butler" and "Baby Pride" chairs of other companies.

The single question presented is: Did the salesmen per-

form services in employment, as defined by the Unemployment Compensation Act, *N. J. S. A.* 43:21–19(*i*)(1) and (6)? For convenience, we reproduce the text of the statute, as well as the language of *N. J. S. A.* 43:21–19(*p*).

"(i)(1) 'Employment' means service, including service in interstate commerce performed for remuneration or under any contract of hire, written or oral, express or implied.

* * * * * * * *

(i)(6) Services performed by an individual for remuneration shall be deemed to be employment subject to this chapter unless and until it is shown to the satisfaction of the division that

(A) such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact; and

(B) such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

(C) such individual is customarily engaged in an independently established trade, occupation, profession or business.

* * * * * * * *

(p) 'Remuneration' means all compensation for personal services, including commissions and bonuses and the cash value of all compensation in any medium other than cash."

The Unemployment Compensation Act, *N. J. S. A.* 43:21–1 *et seq.*, represents an exercise of the reserve police power of the State. Its purpose is to protect the welfare of the people by providing a cushion against the shocks and rigors of unemployment. *N. J. S. A.* 43:21–2; *Bogue Electric Co. v. Board of Review, etc.*, 21 *N. J.* 431, 435 (1956). Being remedial, it should be liberally construed to accomplish that end, with the result that the relation of employer and employee may be deemed to exist under circumstances which would not lead to that determination under the common-law classification.

Since *N. J. S. A.* 43:21–19(*i*)(1) defines employment as "service * * * for remuneration or under any contract of hire," and subsection (*p*) defines remuneration as "all compensation for personal services," the first question to be determined is whether the salesmen performed personal services for petitioner for remuneration. It is only if this

question is decided in the affirmative that resort is to be had to the provisions of *N. J. S. A.* 43:21–19(*i*)(6)(*A*), (*B*) and (*C*), the so-called ABC test. *Fuller Brush Co. v. Industrial Commission of Utah,* 99 *Utah* 97, 104 *P. 2d* 201, 129 *A. L. R.* 511 (*Sup. Ct.* 1940); *Journal Publishing Co. v. State Unemployment Compensation Commission,* 175 *Or.* 627, 155 *P. 2d* 570 (*Sup. Ct.* 1945); *Henry Broderick, Inc. v. Riley,* 22 *Wash. 2d* 760, 157 *P. 2d* 954 (*Sup. Ct.* 1945). (The applicable provisions of the unemployment compensation statutes of these states are identical with the New Jersey act.)

No test as to what constitutes personal service has been precisely spelled out by the cases. Whether personal services are performed depends entirely upon the factual complex of a particular case. Counsel for petitioners concedes that the common-law definition of the term "service" would not apply in the statutory context since the statute contemplates a broader definition. Indeed, the terms "employment," "personal services," and "wages" have a much more comprehensive meaning and application than their common-law counterparts, and encompass in their coverage many persons and relationships not included in the common-law relationship of master and servant. *Journal Publishing Co. v. State Unemployment Compensation Commission,* above; *Creameries of America, Inc. v. Industrial Commission,* 98 *Utah* 571, 102 *P. 2d* 300 (*Sup. Ct.* 1940); *Singer Sewing Machine Co. v. Industrial Commission of Utah,* 104 *Utah* 175, 134 *P. 2d* 479 (*Sup. Ct.* 1943). Petitioners admit there must be something more than a lack of control over the operation of the salesmen in order to negate the performance of personal services.

In determining whether the relationship is within the act, the Division of Employment Security and the court will look behind the contract to the actual situation—the status in which the parties are placed by the relationship that exists between them. *Singer Sewing Machine Co. v. Industrial Commission of Utah,* above. The test is two-fold: Did the alleged employee render personal services for the

alleged employer and, if so, was he entitled to remuneration therefor (wages, commissions, bonuses, or the cash value of all compensation in any medium other than cash, *N. J. S. A.* 43:21-19(*p*))?

Petitioners suggest that the proper test would appear to be: Whose customers are the ultimate purchasers? If they are customers of the alleged employer, then admittedly the salesmen are performing personal services for him. However, if they are customers of the salesmen, then the salesmen perform no personal services for the alleged employer, but for the customers. Petitioners claim that the latter is the case here, and rely heavily upon the *Fuller Brush Co.* case, cited above.

In *Singer Sewing Machine Co. v. Industrial Commission of Utah,* above, the Utah Supreme Court specifically referred to its previous decision in the *Fuller Brush Co.* case and the misunderstanding which apparently had arisen with respect thereto. It pointed out that in the *Fuller* case it had found from the facts presented that the individual involved was a vendee of the company and therefore no service relationship obtained. And see in this connection, *Schomp v. Fuller Brush Co.,* 124 *N. J. L.* 487 (*Sup. Ct.* 1940), affirmed 126 *N. J. L.* 368 (*E. & A.* 1941), where the facts would more readily form the basis for a holding that personal services were not performed for the employer. The court there found that notwithstanding the apparent "dealer" relationship ("Schomp was a salesman who paid for the merchandise by cash in advance or by a debiting of his letter of credit, and his services produced remuneration on a commission basis," (124 *N. J. L.* at *page* 491)), a true vendor-vendee relationship did not exist. In short, Schomp was performing personal services for the alleged employer, and test (*C*) under *N. J. S. A.* 43:21-19(*i*)(6) was held not to have been met since Schomp was not customarily engaged in an independently established trade, occupation, profession or business. See, also, *Creameries of America, Inc. v. Industrial Commission,* above, where the court found that a dealer who, under a franchise agreement, purchased dairy

products from the company was not actually a true vendee, but performed personal services for wages; and *Journal Publishing Co. v. State Unemployment Compensation Commission,* above, where it was held that a distributor of newspapers performed services for remuneration and did not escape the coverage provisions of the Oregon Unemployment Act.

Petitioners' claim that purchasers of the baby chairs were customers of the salesmen presupposes that the latter were the vendors, with title that could pass from them to the customers. There is no evidence whatsoever of a vendor-vendee relationship between petitioners and their salesmen which would place title in the latter. Title passed directly from the petitioners to the customers. Although no definite selling price was given to a salesman, there was, in fact, a minimum price which the petitioners had to realize from each sale. Everything above that minimum price went to the salesman as his commission, but it was not left to the salesman to sell the item below the amount due to petitioners. The latter retained title until actual delivery and the customers paid them the major portion of the purchase price. Petitioners bore the risk of default; if a customer failed to pay the balance due on his purchase, the salesman retained the downpayment and Gilchrist or the company had to look to the customer to recover whatever was due on the minimum price.

That it is established that the salesmen here involved were performing personal services for remuneration for the petitioners can be seen from an examination of the *Schomp* case, above, and the New Jersey cases hereinafter cited, as well as the many cases analyzed in the Annotation, "Salesmen on commission as within unemployment compensation or social security acts," 29 *A. L. R. 2d* 751 (1953), supplementing a similar annotation appearing in 138 *A. L. R.* 1413 (1942).

Of course, the commissions received by the salesmen fell squarely within the statutory definition of remuneration found in our Unemployment Compensation Act, *N. J. S. A.* 43:21-19(*p*), quoted above.

Petitioners place some reliance upon the case of *Texas Co. v. N. J. Unemployment Compensation Commission,* 132 *N. J. L.* 362 (*Sup. Ct.* 1945), affirmed 134 *N. J. L.* 614 (*E. & A.* 1946). That case involved the application of what is generally referred to as the contractor-subcontractor "tacking" clause of the Unemployment Compensation Act, *N. J. S. A.* 43:21–19(*g*), and the relationship created under a consignment agreement entered into between The Texas Co. and R. F. & R. L. Height, a partnership. The court held that a consignee with two places of business, who is engaged in the business of selling a multiple line of products produced by many manufacturers, was not a contractor or subcontractor of The Texas Co., the consignor, within the meaning of *subsection* 19(*g*) of the act. That subsection is not involved in this case.

Since the salesmen were performing personal services for remuneration, these services are deemed employment subject to the act unless the requirements of the ABC test, *N. J. S. A.* 43:21–19(*i*)(6), are fulfilled. All three of these conditions must co-exist; when the service relationship fails to meet any one of the tests, statutory "employment" obtains. *Schomp v. Fuller Brush Co.,* above, 124 *N. J. L.,* at *page* 489. So it is that our courts have held that the service involved in the following cases constituted employment for failure to meet one or more of the ABC tests: (1) failure to meet test B: *Empire Theatre, Inc. v. Unemployment Compensation Commission of New Jersey,* 136 *N. J. L.* 254 (*Sup. Ct.* 1947), affirmed 137 *N. J. L.* 301 (*E. & A.* 1948); (2) failure to meet tests A and C: *Schomp v. Fuller Brush Co.,* above; *Electrolux Corp. v. Board of Review* (two cases), 129 *N. J. L.* 154 (*E. & A.* 1942), and 129 *N. J. L.* 157 (*E. & A.* 1942); (3) failure to meet tests A, B and C: *Steel Pier Amusement Co. v. N. J. Unemployment Compensation Commission,* 127 *N. J. L.* 154 (*Sup. Ct.* 1941); *Superior Life, Health & Accident Ins. Co. v. Board of Review, etc.,* 127 *N. J. L.* 537 (*Sup. Ct.* 1942); *William H. Goldberg & Co., Inc. v. Division of Employment Security,* 21 *N. J.* 107 (1956).

Respondent does not address itself to the question of whether tests A and B are applicable, but maintains that test C obviously has not been met. We agree with that conclusion.

Test C requires that "such individual is customarily engaged in an independently established trade, occupation, profession or business." As was pointed out in *Fuller Brush Co. v. Industrial Commission of Utah,* above, 99 *Utah* 97, 104 *P. 2d* 201, 129 *A. L. R.* 511 (*Sup. Ct.* 1940), "independently" clearly modifies the word "established." It therefore carries the meaning that the "trade, occupation, profession or business" was established independently of the employer or the rendering of the personal service forming the basis of the claim. The present tense of the verb, "is," indicates that the employee must be engaged in such independently established activity at the time of rendering the service involved. And "customarily" means usually; habitually; according to the custom, general practice or usual order of things; regularly.

The fact that a salesman who works on commission must rely on his efforts and ability to secure orders to make a livelihood does not necessarily mean that he is working for himself as an entrepreneur or businessman, within the intendment of test C. The double requirement that an individual must be "customarily engaged" and "independently established" calls for an enterprise that exists and can continue to exist independently of and apart from the particular service relationship. The enterprise must be one that is stable and lasting—one that will survive the termination of the relationship.

The stipulated facts show an absence of any form of independently established business customarily engaged in by petitioners' salesmen. We again refer to some of the stipulated facts. The salesmen operated from their own homes; they had no individual or separate business establishments, offices or special equipment. They used their own private cars, without commercial registration. They had no business telephone listing or business stationery. They reported to

petitioner's office about once a month to settle accounts, and from time to time attended business get-togethers there. Petitioner owned and kept possession of the products until they were not only sold but delivered to the customers, and assumed all credit risks on sales. When a sale was effected on a door-to-door solicitation, it was written down on a purchase order form carrying the name of Gilchrist, later Stroll-O-Chair, Inc. The deposit collected by the salesman represented the amount of his commission, and when it did not, the commissions reflected in the balances collected by petitioner were paid to the salesman at the end of each month. And, as has been pointed out, when a customer defaulted, petitioner assumed the possible loss and the salesman retained his commission. On termination of the service relationship with any salesman, petitioner could immediately send another salesman into the territory to serve his previous and new customers. The commercial advantage possessed by petitioner's business, due to its established popularity, reputation, patronage, advertising and location, over and beyond its mere stock or capital—the good will, if any, established by the sale of Stroll-O-Chairs, belonged to petitioner and not to the salesmen.

The salesmen's livelihood clearly depended upon their continued connection with Gilchrist or the successor company. If that relationship terminated, so did their means of livelihood, at least until they secured other employment selling or performing some other type of service for another employing unit.

As we have already indicated, in *Schomp v. Fuller Brush Co.* above, the company's contention with respect to the application of test C had far greater support than petitioners' contention here. The applicable facts in that case were briefly summarized as follows:

"* * * In the contract Schomp is designated as a 'dealer.' The agreement provides that the dealer is granted 'the right to purchase the company's merchandise and resell the same' in a particular territory to be fixed; that the company agrees to sell to the dealer, at wholesale prices, at its distributing station, such mer-

chandise as the dealer may desire; that the dealer may not obligate the company, and that the company has no interest 'in the dealer's accounts with his customers.' No retail selling price is fixed in the contract though it appears in the depositions that the dealer's profit on 'regular items' amounts to thirty-three and one-third per cent. There is a provision for the return of any unsold merchandise within thirty days after the termination of the agreement and also that the agreement may be terminated by either upon written notice." (124 *N. J. L.* at *page* 488)

The "dealer" in that case appeared to be customarily engaged in an independently established business; however, on close scrutiny of the relationship between the dealer and the company, the Unemployment Compensation Commission and the court concluded that test C, as well as test A, had not been met.

Test C was also held not to have been met in the two *Electrolux Corp. v. Board of Review* cases, and in the *Superior Life, Health & Accident Ins. Co. v. Board of Review, etc.,* and *William H. Goldberg & Co. v. Division of Employment Security* cases, above.

These cases are fairly dispositive of the question. We hold that the salesmen were performing personal services for remuneration for the petitioners, as defined by the Unemployment Compensation Act, and that test C under *N. J. S. A.* 43:21-19(*i*)(6) has not been met.

Affirmed.