821 A.2d 1157 (2003)
176 N.J. 201
F.B., Plaintiff, and
Monmouth County Division of Social Services, Plaintiff-Appellant,
v.
A.L.G., Defendant-Respondent.
Supreme Court of New Jersey.
Argued March 17, 2003.
Decided May 14, 2003.
*1158 Mary C. Sullivan, Associate Counsel, argued the cause for appellant (Thomas H. Klein, Counsel, Monmouth County Division of Social Services, attorney).
Shailen K. Gupta argued the cause for respondent (Spevack & Cannan, attorneys).
The opinion of the Court was delivered by LaVECCHIA, J.
This appeal involves a movant's attempt to reopen a judgment of paternity and support. This application comes years after judgment was entered in a proceeding in which the putative father waived his right to a paternity test and acknowledged under oath that he was the child's father. Because the motion court made findings based on sufficient credible evidence that no deception or fraud was perpetrated against the father at the time of the earlier *1159 support action when he took those positions, no exceptional circumstances have been demonstrated. Accordingly, movant is not entitled to an order vacating the earlier judgment under the standards for relief from a judgment set forth in Rule 4:50-1.

I.
In 1999, A.L.G. filed a motion to vacate a 1995 judgment of paternity and support for the infant A.G. and to permit genetic testing. The child was the son of F.B., with whom A.L.G. had had an intimate relationship from 1990 through 1998. During that relationship, F.B. gave birth to a second child, as to whom A.L.G. also sought genetic testing.
The motion court denied A.L.G. relief from the earlier judgment in respect of A.G.'s support. The court found that A.L.G.'s prior acknowledgment of paternity was not the result of fraud perpetrated on him by the child's mother, F.B., and further determined that A.L.G. was estopped from contesting now his legal obligation to support A.G. after having acted as the child's father for eight years. The facts as found by the trial court may be summarized as follows.
A.L.G. met F.B. in early 1990, and the two began an intimate dating relationship by late February. At the time, both were college students. Six months later, on August 23, 1990, F.B. gave birth to a boy, named A.G. after A.L.G. The baby weighed nearly eight pounds at birth. The court noted that there was conflicting testimony concerning whether F.B. told A.L.G. that he was not the biological father of A.G. She claimed that she disclosed her pregnancy to A.L.G. when they began their intimate dating relationship. A.L.G. maintained that F.B. first told him she was pregnant later in May and that, when the baby was born, F.B. told him that the child was premature. Although the couple never resided together or married, their relationship continued for years, during which time A.L.G. lived with his mother and became employed as a homicide detective in Newark, and F.B. continued to live in Eatontown.
In 1994, F.B. informed A.L.G. that she was considering seeking public assistance. According to F.B., A.L.G. encouraged her to "do what she had to do" even though he understood that he might be required to provide regular support payments for A.G. F.B. applied for benefits from the Monmouth County Division of Social Services (MCDSS) and, in a sworn statement as part of her duty to cooperate as a condition for public assistance, identified A.L.G. as the father of A.G. According to F.B., she regarded A.L.G. as A.G.'s father in that he cared for the child, supported him, and did "all the things" a father would do for a child. MCDSS then filed the typical paternity and support action against A.L.G. to secure a judgment of support.[1] Waiving his right to a paternity test, A.L.G. acknowledged under oath that he *1160 was A.G.'s father and the court duly entered a judgment of paternity and order for support.
F.B. gave birth to a second son in February 1996. A.L.G. identified himself as the child's father at the hospital and the birth certificate lists him as the father. MCDSS again filed a petition for paternity testing and support against A.L.G.; however, a judgment was never entered. MCDSS withdrew from the matter because F.B. was not seeking public assistance on behalf of the younger child at the time and F.B. did not want a court order entered. A.L.G. was providing support for both children. Indeed, throughout the period of his relationship with F.B., A.L.G. was very involved in the lives of the children. As "Daddy" or "Dad," he spent weekends and holidays with them, bringing gifts at holidays and on birthdays. He gave them cards containing loving notes and money, took them on trips and, at times, to doctor appointments. A.L.G.'s family also enjoyed a close relationship with the children.
A.L.G. brought the motion seeking a paternity test and relief from the support obligation concerning A.G. because he contends that shortly after the couple's relationship ended in 1998 he learned from his sister that he was not A.G.'s father. F.B. allegedly revealed to A.L.G.'s sister that she had an affair with a married neighbor from about the time A.G. was conceived until April 1990. The man is identified in the present record only as "Bubba." After a hearing in which the aforementioned testimony was heard, the trial court denied A.L.G.'s application. The court found A.L.G.'s testimony about being deceived into believing that A.G. was his natural child "difficult to believe" and "ludicrous." The court found F.B. to be credible on the subject that A.L.G. understood that he was not the natural father of A.G. when the child was obviously a full-term newborn, and they had begun intimate relations only six months earlier. A.L.G.'s version of the facts was viewed as nonsensical. Therefore, the court determined that A.L.G. freely and willingly accepted the legal responsibility of support for A.G. when he waived his opportunity for a paternity test during the earlier support proceeding and swore that he was the child's father. In declining to give A.L.G. relief from the prior judgment, the trial court also relied on the "long-term relationship" of the parties, finding numerous facts that supported the conclusion that A.L.G. "acted as and has become a parent" to the boys. In considering the equities of the parties and how each would be affected by the relief sought by A.L.G., the court also noted testimony that A.G. would be emotionally harmed if he learned that A.L.G. was seeking to be relieved of the earlier order declaring him to be A.G.'s father and requiring him to provide support for A.G. Finally, the court concluded that because A.L.G. had acted as a father for eight years, he was equitably estopped from renouncing his support obligations. Genetic testing of the younger child was denied for equitable reasons as well.
The Appellate Division reversed. F.B. v. A.L.G., 350 N.J.Super. 389, 402, 795 A.2d 331 (2002). According to the panel, it is not enough that a person who is not a biological parent has accepted the obligation of support. Id. at 399, 795 A.2d 331. When the parties have not established a family-like living arrangement, there must be some "positive action" by the obligor that interferes with the natural parent's role or a "voluntary and knowing course of conduct" that constitutes an "affirmative representation of parenthood." Ibid. (citation omitted). The Appellate Division determined that no such showing was made here. Id. at 400, 795 A.2d 331. Accordingly, it held that A.L.G. was entitled *1161 to prospective relief from the earlier judgment of support as well as from payment of any arrearage arising from that judgment. Ibid. The court denied A.L.G.'s request for a refund of support that he already had paid. Id. at 401, 795 A.2d 331. In respect of the latter, the court stated that a man assumes a child is biologically his "at his peril," and has recourse only in his ability to seek reimbursement for support already paid from the true biological father. Ibid. The Appellate Division also granted the request for genetic testing of the younger boy.[2]Id. at 400, 795 A.2d 331.
We granted certification, 174 N.J. 362, 807 A.2d 193 (2002).

II.
Rule 4:50-1 provides the mechanism by which a party may obtain relief from a final judgment or order:
On motion, with briefs, and upon such terms as are just, the court may relieve a party or the party's legal representative from a final judgment or order for the following reasons: (a) mistake, inadvertence, surprise, or excusable neglect; (b) newly discovered evidence which would probably alter the judgment or order and which by due diligence could not have been discovered in time to move for a new trial under R. 4:49; (c) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (d) the judgment or order is void; (e) the judgment or order has been satisfied, released or discharged, or a prior judgment or order upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment or order should have prospective application; or (f) any other reason justifying relief from the operation of the judgment or order.
Relief is granted sparingly. Pressler, Current N.J. Court Rules, comment 1.1 on R. 4:50-1 (2003); Hous. Auth. of Town of Morristown v. Little, 135 N.J. 274, 283-84, 639 A.2d 286 (1994). The decision whether to vacate a judgment on one of the six specified grounds is a determination left to the sound discretion of the trial court, guided by principles of equity. Little, supra, 135 N.J. at 283, 639 A.2d 286; Hodgson v. Applegate, 31 N.J. 29, 155 A.2d 97 (1959). That court's judgment will be left undisturbed "unless it represents a clear abuse of discretion." Little, supra, 135 N.J. at 283, 639 A.2d 286; Hodgson, 31 N.J. at 37, 155 A.2d 97; see also Shammas v. Shammas, 9 N.J. 321, 88 A.2d 204 (1952).
It is not essential that an applicant state the subsection pursuant to which relief should be granted, and here A.L.G. has not done so. However, certain subsections clearly are not applicable. Rule 4:50-2 requires an application for relief under subsections (a), (b), and (c) to be brought within one year of the judgment. This application is brought more than four years after entry of judgment. Also, subsection (d) (judgment is void) is inapplicable. Thus, only subsections (e) and (f) pertain. A motion to vacate a judgment pursuant to subsection (e) "on the ground that it is no longer equitable that the judgment should have prospective application must be supported by evidence of changed circumstances." Little, supra, 135 N.J. at 285, 639 A.2d 286. In order to outweigh the public interest in the "finality of judgments," a moving party must demonstrate *1162 "that events have occurred subsequent to the entry of a judgment that, absent the relief requested, will result in `extreme' and `unexpected' hardship." Id. at 285-86, 639 A.2d 286.
In respect of relief under subsection (f) we have said that "[t]he very essence of (f) is its capacity for relief in exceptional situations. And in such exceptional cases its boundaries are as expansive as the need to achieve equity and justice." Ibid. (quoting Court Inv. Co. v. Perillo, 48 N.J. 334, 341, 225 A.2d 352 (1966)). However, like subsection (e), due to the importance ascribed to the finality of judgments, exceptional circumstances must be present in order to justify relief. Little, supra, 135 N.J. at 285, 639 A.2d 286.
As recently stated by Justice Long, writing for a unanimous Court in In Matter of Guardianship of J.N.H., 172 N.J. 440, 474, 799 A.2d 518 (2002):
[w]hether exceptional circumstances exist is determined on a case by case basis according to the specific facts presented.... Among the factors to be taken into account on a Rule 4:50 motion are the `extent of the delay in making the application for relief, the underlying reason or cause, fault or blamelessness of the litigant, and any prejudice that would accrue to the other party.'

[ (citations omitted).]

III.

A.
We turn to the application of Rule 4:50 to this case. The motion court refused to vacate A.L.G.'s prior support order. In finding that A.L.G.'s arguments lacked merit the court primarily relied on its finding that A.L.G. had not been deceived into believing that he was A.G.'s natural father when he agreed to undertake a support obligation. That determination by the motion court precluded a finding of changed circumstances, necessary to support the requested relief from the prior judgment. Moreover, in performing a thorough examination in order to determine whether there were exceptional circumstances, the court considered the long-time paternal relationship that A.L.G. had with the boys in which he held himself out to them and to others as their father. A.L.G. apparently encouraged his family members in the extended-family relationship that they developed with the boys. The court appropriately determined that these facts militated against granting the inherently equitable relief being sought. Also, the court gave due weight to the emotional harm that would occur to the child if A.L.G. prevailed.
The trial court's determination that there were no exceptional circumstances has ample support in this record. The court did not abuse its discretion when it denied A.L.G.'s application for genetic testing and refused to grant him relief from the support judgment that A.L.G. had freely accepted in the course of the earlier judicial proceeding. As the court's decision highlights, this was not a situation in which a default judgment was entered against A.L.G., depriving him of his opportunity to be heard on the merits before he was ordered to provide support on behalf of a child. He had a full opportunity to present opposition to a legally imposed duty to support A.G. Not only did he choose not to oppose the application, he submitted a sworn statement that he was accepting the denomination of "father" to A.G. He further underscored the certainty of his position by declining a paternity test available to him at the time.
The case is a far cry from the facts in Monmouth County Social Services v. P.A.Q., 317 N.J.Super. 187, 721 A.2d 738 (App.Div.1998), in which a support order *1163 was vacated pursuant to Rule 4:50-1(f) on the basis of exceptional circumstances. In P.A.Q., the defendant was not served with a child support summons meant for him but mistakenly served on his brother. Id. at 191, 721 A.2d 738. The defendant failed to appear. Ibid. In that default context, the trial court entered a support order. Ibid. Eight months later, and again sixteen months later, the county filed enforcement motions. Ibid. Defendant failed to appear in each instance. Ibid. Eventually, he was arrested on a warrant, made a partial payment and then faced support arrearages totaling $9,675. Ibid. Defendant thereupon sought a rehearing on paternity, and volunteered to undergo testing at his own expense. Ibid. The county did not object to a rehearing on future support so long as the defendant was not excused from paying arrearages. Id. at 192-93, 721 A.2d 738. The test conclusively excluded the defendant's paternity and accordingly the trial court vacated the support order concerning future support, but ordered defendant to pay the arrearage. Id. at 193, 721 A.2d 738. The Appellate Division reversed, determining that the trial court should have vacated the entire judgment, including the arrearage. Ibid.
Here, the support order was not entered in the context of a default judgment. Defendant's support obligation arose when he affirmatively submitted to the court and signed a sworn Admission of Paternity. The findings of the court below, based on its credibility assessment to which we defer, are that defendant knew at that time the child was not biologically his and nonetheless accepted a legal obligation to support A.G. Those facts differ significantly from the facts present in P.A.Q. Therefore, that decision is not persuasive in this appeal.
In this case, the motion court's determination was based on sufficient credible evidence in the record. In reaching its judgment the court did not abuse its discretion and its determination should not be disturbed.

B.
The Appellate Division reached a contrary view on the presence of exceptional circumstances based largely on its consideration of the principle of in loco parentis. Briefly, the principle was defined in Brinkerhoff v. Merselis' Ex'rs, 24 N.J.L. 680, 683 (1855): "The proper definition of a person in loco parentis to a child is, a person who means to put himself in the situation of the lawful father of the child, with reference to the father's office and duty of making provision for the child." (citations and internal quotation marks omitted). Generally, the in loco parentis relationship lasts only as long as the parties so desire. See, e.g., Schneider v. Schneider, 25 N.J. Misc. 180, 184-85, 52 A.2d 564 (Ch.1947) (" `Loco parentis has to do with custody, liability to support, and the like, and is temporary in character, and is not to be likened to[ ] adoption.' ") (internal citation omitted), overruled in part on other grounds, Falzo v. Falzo, 84 N.J.Super. 343, 202 A.2d 192 (App.Div. 1964). However, the doctrine of equitable estoppel has been used to obligate parties who act in loco parentis to continue support. Miller v. Miller, 97 N.J. 154, 478 A.2d 351 (1984); Savoie v. Savoie, 245 N.J.Super. 1, 583 A.2d 762 (App.Div.1990); Ross v. Ross, 126 N.J.Super. 394, 314 A.2d 623 (J. & D.R. Ct.1973).
The Appellate Division took a strict view of the principle's applicability, stating that "by its own terms, the principle has limited, if any, application [where] ... there is no traditional family setting, i.e., no marriage or even continuing cohabitation over time." F.B., supra, 350 N.J.Super. at 400, 795 A.2d 331. The panel appears to have equated the absence of an in loco parentis *1164 relationship with the existence of exceptional circumstances necessary to afford A.L.G. relief from his support order. In further explanation of why extraordinary circumstances were not present here, the court compared A.L.G.'s situation to that where "another person has supplanted [the natural father] as a functioning parent and has actively impaired [his] relationship with the child." Ibid. (citing Miller, supra, 97 N.J. at 162-67, 478 A.2d 351). The Appellate Division concluded that "as a matter of law, in the absence of a familylike structure or extraordinary circumstances, the in loco parentis principle and its waiver or estoppel effects may not be used as a surrogate for biological parenthood." F.B., supra, 350 N.J.Super. at 400, 795 A.2d 331.
We restate: A.L.G. has not demonstrated a justification under Rule 4:50 for relief from the prior order declaring him father to A.G., with a corresponding support obligation for the child. This is a belated attempt to withdraw from the posture taken by A.L.G. in the earlier proceeding that culminated in a support order entered against him. The motion court appropriately did not permit A.L.G. to disavow the position he took in the earlier judicial proceeding when nothing has changed other than that A.L.G.'s relationship with F.B. has ended. Indeed, we understand from the record and oral argument that A.L.G. continues his visitations with the younger child. Sadly, and perhaps because of this litigation, he no longer includes A.G. in those visits.
This appeal must focus on the standard for relief from a judgment set forth in our court rules. A.L.G. has not met that standard. The Appellate Division's introduction at this stage of the proceeding of a "bright-line" requirement of continuing cohabitation for an in loco parentis relationship is a distortion of that principle and diverts attention from the proper standard for relief from a prior judgment. The principle of in loco parentis might have had applicability when A.L.G.'s support order initially was entered had A.L.G. contested an obligation for support. However, the principle cannot provide a basis for relief from a support order more than four years after the entry of that order.
In conclusion, we hold that the trial court acted correctly when, in the absence of proof of fraud, it denied defendant relief from the judicial order of support entered against him in a proceeding in which he participated and affirmatively acknowledged that he was assuming paternal responsibility for the child.
Our holding is consistent with our reasoning in In re Trust Created By Agreement Dated Dec. 20, 1961, 166 N.J. 340, 765 A.2d 746, cert. denied sub nom. Ryan v. Johnson, 534 U.S. 889, 122 S.Ct. 203, 151 L.Ed.2d 143 (2001). In that case, a grantor of a charitable trust authorized the trustees under certain conditions to distribute the trust's income among the grantor's grandchildren. Id. at 345, 765 A.2d 746. The grantor included his son's daughter as one of the trust's "measuring lives" and also as a potential beneficiary. Ibid. About a year after the trust was created, the son filed for divorce, claiming that he was not the daughter's biological father. Id. at 346, 765 A.2d 746. During the course of the divorce litigation, however, the son signed a notarized document acknowledging paternity. Ibid. The trial court's divorce judgment specifically reflected the son's paternity of the daughter. Id. at 347, 765 A.2d 746.
Years later, certain third-party beneficiaries of the trust sought to defeat the daughter's eligibility as a potential beneficiary by challenging the parentage determination established in the earlier divorce litigation. Id. at 348, 765 A.2d 746. In foreclosing that challenge, we cited the *1165 New Jersey Parentage Act, which provides that a court judgment or order "determining the existence or nonexistence of the parent and child relationship is determinative for all purposes." Id. at 352, 765 A.2d 746 (citing N.J.S.A. 9:17-53a). We explained that "[t]he policy favoring the integrity of the family unit is especially compelling in cases in which there has been a prior adjudication or acknowledgment of paternity." Id. at 358, 765 A.2d 746.
This case implicates the same principles. We are satisfied that A.L.G.'s acknowledgment of paternity as codified in the trial court's judgment should not be disturbed in the present setting. Absent fraud, "[t]here is nothing unjust or arbitrary about preserving a prior adjudication of paternity." Id. at 361, 765 A.2d 746. To the contrary, as reflected in the Parentage Act, this State's public policy "strongly favors the finality of such judgments." Ibid. Accordingly, A.L.G. is bound to his acknowledgment and the trial court's judgment that conclusively established his paternity of A.G. and his support obligations to the child.

IV.
The judgment of the Appellate Division is reversed and the matter is remanded to the trial court for re-entry of its judgment concerning A.G.'s support.
For reversal and remandmentChief Justice PORTIZ and Justices COLEMAN, LONG, VERNIERO, LaVECCHIA and ZAZZALI6.
OpposedNone.
NOTES
[1] The denomination of the parties in that action is continued in this appeal from A.L.G.'s motion. The support action, involving both F.B. and MCDSS as plaintiffs, is required by the federal Aid to Families with Dependant Children (AFDC) program, which provides subsistence welfare benefits to needy families. 42 U.S.C. §§ 601-617. To qualify for federal funds, a State must certify that it will operate a child support enforcement program that conforms with the requirements of the Act, including, among other things, a comprehensive system to establish paternity, locate absent parents, and help families obtain support orders. 42 U.S.C. § 651; see generally N.J.A.C. 10:90-16.10 to -16.25 (implementing New Jersey's child support enforcement program). Recipients must assign their child support rights to the State and fully cooperate with the State's efforts to secure support orders. 42 U.S.C. § 602(a)(26); N.J.A.C. 10:90-16.12(b)-(c).
[2] On remand, that genetic testing revealed that A.L.G. is the younger child's biological father to a 99.99% degree of probability.