**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0702-24

CHRIS G. ALEVRAS,
d/b/a CGA ASSOCIATES,

     Plaintiff-Appellant,

v.

WILSON BREWSTER, JR.,
as Executor of the
Estate of THOMAS R.
ASHLEY,[1]

     Defendant-Respondent.

_____

Submitted January 13, 2026 – Decided January 30, 2026

Before Judges Firko and Perez Friscia.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. DC-016113-22.

Chris G. Alevras, self-represented appellant.

Michael T. Ashley (Ashley Law), attorney for respondent.

---

[1] Regrettably, Thomas R. Ashley passed away during the pendency of this appeal. The caption was amended to reflect this change.

PER CURIAM

In this Special Civil Part matter, plaintiff Chris G. Alevras, doing business as CGA Associates (Alevras or CGA) (collectively plaintiff), appeals from two orders: (1) a May 10, 2024 order granting defendant Wilson Brewster, Jr. as the executor of the Estate of Thomas R. Ashley's (Thomas)[2] (collectively defendant) motion to vacate default judgment under Rule 4:50-1(a); and (2) a September 26, 2024 order dismissing the complaint with prejudice on the basis Alevras was an independent contractor and not an employee of defendant. We affirm both orders under review.

I.

Factual Background

The following facts are derived from the record. Decedent Thomas R. Ashley hired plaintiff to perform paralegal services, including brief writing, for his law firm. On December 9, 2022, Alevras individually filed a complaint against defendant, which is not contained in the record. On February 2, 2023, Alevras filed a verified amended complaint—the operative pleading here—against defendant alleging breach of contract, a violation of subsection 4.10(c)

---

[2] Parties who share a last name with other individuals are referred to by their first names for the ease of reference. By doing so, we intend no disrespect.

A-0702-24

of New Jersey's Wage Payment Law (WPL), N.J.S.A. 34:11-4.1 to -4.14, for being deprived of vacation pay, liquidated damages pursuant to the penalty provision set forth in the WPL, promissory estoppel, unjust enrichment, and quantum meruit.

In the verified amended complaint, Alevras alleged Thomas and his law firm entered into a contract whereby Alevras was "retained and employed" at a weekly salary of $1,000. Alevras claimed he was ineligible for any bonus or profit. Alevras has a bachelor's degree in business, a master's degree in finance, and a law degree. Alevras was provided with an office and certain office equipment. According to Alevras, Thomas agreed to reimburse him for essential work-related expenses, such as PACER account subscription fees, and a Gann Law book subscription, for three years, upon submission of invoices to his office manager.

Alevras alleged Thomas agreed to pay CGA bi-weekly by check and work-related expenses would be reimbursed upon submission of paid invoices. Thomas commenced paying plaintiff by wire transfer in January 2019, which caused plaintiff to incur a $15 bank processing fee for each payment. Commencing in 2021, Alevras alleged defendant discontinued paying him

3

vacation pay, in violation of the WPL, entitling him to recover exemplary damages in an additional amount of $8,000.

On March 10, 2023, Alevras filed a motion for leave to file and serve an amended complaint to add "d/b/a CGA Associates," the business name under which he conducted paralegal services.

On March 20, 2023, defendant filed an answer and a counterclaim. Defendant generally denied the allegations in the verified complaint. The counterclaim alleged the verified complaint was frivolous because CGA did not have an employment relationship with defendant, and CGA was instead an independent contractor. The counterclaim alleged no employment agreement existed between the parties, and the verified complaint was filed in "bad faith" because CGA was "fully paid" for its services as an independent contractor. CGA filed an answer to the counterclaim denying the allegations.

The parties exchanged discovery and had two unsuccessful mediation sessions. A jury trial was scheduled for February 14, 2024. At the request of defendant's counsel, the trial was adjourned to March 26, 2024. A postcard and an email were addressed to Thomas and his attorney, Michael Ashley, advising of the new trial date. Nonetheless, no one appeared on behalf of defendant on the trial date. The court conducted a proof hearing that day and entered a default

4

judgment against Thomas and in favor of CGA in the amount of $12,511, which included $201 in costs. The court also struck defendant's answer and counterclaim.

Motion to Vacate Default Judgment

On April 20, 2024, defendant filed a motion to vacate the default judgment and reinstate its pleadings pursuant to Rule 4:50-1(a), based on "mistake and/or inadvertence" and claiming he had a meritorious defense. In his moving certification, defendant's counsel conceded he received several emails from the clerk of the court, a postcard with the new trial date, and indicated the new trial date was calendared on the office computer system. However, he alleged the date was somehow inadvertently deleted.

Thomas's secretary also submitted a certification stating the new trial date was "inexplicably deleted" from the office calendar. The secretary certified it was her practice to "review the upcoming appearances with the attorneys for the following week at least one week prior to the events" and to "go over each day's court dates the day before." Having done this practice the week before the trial in this matter was scheduled, the secretary certified she knew "it was not on the calendar for March 26, 2024, at those times."

Thomas certified he had a meritorious defense based on plaintiff's fraudulent representations that it was an employee and not an independent contractor. Thomas certified he had been practicing law for "almost fifty-six years" and "never failed to appear in court unless severely ill, and in such circumstances, he always had someone appear on [his] behalf." Plaintiff filed opposition to defendant's motion, contending the allegations did not constitute excusable neglect and that he failed to demonstrate a meritorious defense.

On May 10, 2024, the court granted defendant's motion to vacate the default judgment, denied oral argument as unnecessary, found that defendant had shown excusable neglect pursuant to Rule 4:50-1, and set forth a meritorious defense. The matter was restored to the active trial list.

### The Trial

A two-day bench trial was conducted on August 22 and 29, 2024. Alevras testified as to his claim for unpaid wages, which comprised of four weeks of vacation pay (two weeks in 2021 and two weeks in 2022), at $1,000 per week, plus a 200% penalty under the WPL. Alevras also claimed that for the first nine years of the parties' association, he received two weeks' vacation pay each year. However, Alevras testified that in 2021, after he took his two weeks' vacation, he asked Michael where his vacation pay was, and Michael declined to pay him

A-0702-24

for it.  In 2022, Alevras testified he did not bother to ask for vacation pay because he knew it would not be paid.

Thomas testified he paid for Alevras's vacation pay in the past, but stopped:

> A.  I paid for Mr. Alevras'[s] vacation, I . . . don't think it was nine straight years, but I was generous, and I didn't have no angst with the man.  And he said I'm going on a vacation, will you pay me?  And I said yes.  That was out of the goodness of my heart.  It wasn't that I felt obligated to do it at all at any time.
>
> Q.  And is it correct that when he asked you for vacation pay in 2021 you declined to pay him?
>
> A.  Right.  Correct.
>
> Q.  And why did you do that?
>
> A.  Well, I was getting reports that he was answering . . . my telephone, and saying "law offices," and it gave the impression to my clients that he was actually a lawyer, and that he was affiliated with me.  And so I started rethinking my . . . relationship with him.  And it caused me to feel like I should not be paying him for any vacation pay because I felt that the impression may be that in fact he was working for me and therefore I wanted no part of that.  And so I stopped paying him for vacation.  I was a nice guy.  He was not a nice guy. So I decided I wasn't going to pay him anymore.
>
> . . . .

A-0702-24

. . . based upon representations I decided that I would completely dissociate myself with him to the point where I would pay no more vacations.

Thomas clarified that he had paid for Alevras's vacation pay in the past, but "not because [he] was an employee." Alevras also testified about unreimbursed expenses he incurred on defendant's behalf. Alevras claimed Thomas paid his reimbursements for nine years by way of a separate check, then stopped. Alevras testified he never received a 1099 form from Thomas. Plaintiff moved invoices and bank statements into evidence.

The Court's Opinion

On September 26, 2024, the court rendered an oral opinion finding plaintiff was an independent contractor and not an employee. The court stated:

> So if we look at the criteria in Hargrove v. Sleepy's, [LLC, 220 N.J. 289 (2015)] we have to see if . . . defendant[] can overcome [his] burden in this case. And number one is such individual has been and will continue to be free from control or direction over the performance of such service, both under his contractor of service and in fact, and it's clear that [defendant] would ask . . . plaintiff to either write briefs, or perform research, and the [c]ourt finds that [defendant] did not assert such control over Alevras, so [defendant] has satisfied requirement number one.
>
> Number two, such services either outside the usual course of business for which such services performed, or that such services performed outside all of the places of business of the enterprise for which

8

such service is performed, and . . . CGA was writing briefs and performing research, and that service could have been performed anywhere, and it was in an office that was [CGA], so the [c]ourt finds that [defendant] has satisfied point two.

And number three, such individual is customarily engaged in an independently established trade, and CGA is in the trade of performing research and writing briefs.

So the [c]ourt finds that [defendant] has established points one, two and three, so [defendant] has satisfied its burden, and so the [c]ourt finds that . . . plaintiff <u>was not an employee of [defendant]</u>, and . . . plaintiff does not sustain his burden of proof, so . . . plaintiff's complaint is dismissed with prejudice.[3]

[(Emphasis added).]

A memorializing order was entered. This appeal followed.

Before us, plaintiff presents the following arguments:

(1) the order vacating default judgment is per se invalid because it is bereft of findings of fact or legal conclusions;

(2) it was plain error and an abuse of discretion to grant defendant's motion to vacate default judgment and deny plaintiff's request for costs and expenses; and

---

[3] The court did not render a decision on defendant's counterclaim. This issue is not before us, and we deem it waived. <u>State v. Huang</u>, 461 N.J. Super. 119, 125 (App. Div. 2018); <u>see also</u> Pressler & Verniero, <u>Current N.J. Court Rules</u>, cmt. 5 on <u>R.</u> 2:6-2 (2026) ("It is, of course, clear that an issue not briefed is deemed waived.").

(3) plaintiff was an employee of defendant.

II.

Relief under Rule 4:50-1, except for relief from default judgments, is "granted sparingly," and in exceptional circumstances. F.B. v. A.L.G., 176 N.J. 201, 207-08 (2003). "The decision whether to vacate a judgment . . . is a determination left to the sound discretion of the trial court, guided by principles of equity." Id. at 207. A court should view vacating a default judgment under Rule 4:50-1 "with great liberality, and should tolerate 'every reasonable ground for indulgence . . . to the end that a just result is reached.'" Mancini v. EDS ex rel. N.J. Auto. Full Ins. Underwriting Ass'n, 132 N.J. 330, 334 (1993) (quoting Marder v. Realty Constr. Co., 84 N.J. Super. 313, 319 (App. Div. 1964)).

On appeal, "[t]he decision granting or denying an application to open a judgment will be left undisturbed unless it represents a clear abuse of discretion." Hous. Auth. of Morristown v. Little, 135 N.J. 274, 283 (1994). See U.S. Bank Nat'l Ass'n v. Guillaume, 209 N.J. 449, 467 (2012) (Rule 4:50-1 decision "warrants substantial deference"). An abuse of discretion is a decision "'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Iliadis v. Wal-Mart Stores, Inc.,

191 N.J. 88, 123 (2007) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

III.

First, plaintiff argues the order vacating default judgment is per se invalid due to a lack of factual findings or conclusions of law pursuant to Rules 1:7-4(a) and 1:6-2(f). Without such reasons, plaintiff maintains this court cannot determine whether the court's decision was an abuse of discretion or an incorrect conclusion of law. Plaintiff asks this court to exercise original jurisdiction under Rule 2:10-5, "as is necessary to the complete determination of any matter on review," rather than remanding the case.

Rule 4:50-1 "governs an applicant's motion for relief from default when the case has proceeded to judgment." Guillaume, 209 N.J. at 466. Pursuant to Rule 4:50-1, "on motion, with briefs, and upon such terms as are just, the court may relieve a party or the party's legal representative from a final judgment or order for the following reasons":

> (a) mistake, inadvertence, surprise, or excusable neglect; (b) newly discovered evidence which would probably alter the judgment or order and which by due diligence could not have been discovered in time to move for a new trial under R[ule] 4:49; (c) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (d) the judgment or order is void; (e) the

11

judgment or order has been satisfied, released or discharged, or a prior judgment or order upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment or order should have prospective application; or (f) any other reason justifying relief from the operation of the judgment or order.

[(R. 4:50-1) (emphasis added).]

Here, Thomas invoked subsection (a), requesting the judgment against him be vacated due to "excusable neglect." In terms of timing, a party has one year to file a motion to vacate under subsection (a). See R. 4:50-2 ("for reason[] (a) . . . of R[ule] 4:50-1 not more than one year after the judgment, order or proceeding was entered or taken."). Relief under Rule 4:50-1 "'is designed to reconcile the strong interests in finality of judgments and judicial efficiency with the equitable notion that courts should have authority to avoid an unjust result in any given case.'" Mancini, 132 N.J. at 334 (quoting Baumann v. Marinaro, 95 N.J. 380, 392 (1984)).

Rule 4:50-1 is "granted sparingly," and in exceptional circumstances, except for relief from default judgments. F.B., 176 N.J. at 207. Therefore, a court should view "the opening of default judgments . . . with great liberality," and should tolerate "every reasonable ground for indulgence . . . to the end that a just result is reached." Marder, 84 N.J. Super. at 319. "The decision whether

to grant such a motion is left to the sound discretion of the trial court, and will not be disturbed absent an abuse of discretion." Mancini, 132 N.J. at 334. However, all doubts "should be resolved in favor" of the party seeking relief. Arrow Mfg. Co., Inc. v. Levinson, 231 N.J. Super. 527, 534 (App. Div. 1989).

To succeed on a Rule 4:50-1(a) motion, a defendant must demonstrate two-steps: "'a defendant seeking to reopen a default judgment [because of excusable neglect] must show that the neglect to answer was excusable under the circumstances and that he [or she] has a meritorious defense.'" Mancini, 132 N.J. at 334-35 (first alteration in original) (quoting Morales v. Santiago, 217 N.J. Super. 496, 501 (App. Div. 1987)). Therefore, "[t]he circumstances constituting excusable neglect" remain "fact-sensitive." Pressler & Verniero, Current N.J. Rules, cmt. 5.1.2 on R. 4:50-1 (2026). Here, plaintiff argues Thomas's bald denial as to the allegations set forth in the verified complaint is insufficient to demonstrate a meritorious defense. We disagree.

Our standard of review warrants substantial deference to a trial court's determination on a motion to vacate a default or a default judgment, which "should not be reversed unless it results in a clear abuse of discretion." Guillaume, 209 N.J. at 467; see Little, 135 N.J. at 283; see also Mancini, 132 N.J. at 334. An abuse of discretion occurs when a decision is "'made without a

13

rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Guillaume, 209 N.J. at 467-68 (quoting Iliadis, 191 N.J. at 123.).

A motion to vacate default judgment implicates two competing goals:  the desire to resolve disputes on the merits, and the need to efficiently resolve cases and provide finality and stability to judgments.  In balancing these two goals, we favor the party seeking relief, because of the high value we place on deciding cases on their merits.  See Davis v. DND/Fidoreo, Inc., 317 N.J. Super. 92, 100-01 (App. Div. 1998) (stating that doubts should be resolved in favor of the applicant in order to secure a trial upon the merits).

"A court should view 'the opening of default judgments . . . with great liberality,' and should tolerate 'every reasonable ground for indulgence . . . to the end that a just result is reached.'" Mancini, 132 N.J. at 334 (quoting Marder, 84 N.J. Super. at 319, aff'd, 43 N.J. 508 (1964)).

Here, we need not decide whether defendant's vacatur motions should have been held to the more stringent standard set forth in Rule 4:50-1(a), or the relaxed standard outlined in Rule 4:43-3.  We are satisfied defense counsel's honest mistake, and his office's failure to diary the second trial date, satisfied both the "excusable neglect" and "good cause" thresholds respectively required

14

under Rules 4:50-1(a) and 4:43-3. Indeed, we have observed that "[e]xcusable neglect" may be found when the default was "attributable to an honest mistake that is compatible with due diligence or reasonable prudence." Guillaume, 209 N.J. at 468 (quoting Mancini, 132 N.J. at 335).

We reject plaintiff's argument that the court failed to comply with Rule 1:7-4(a), which provides:

> The court shall, by an opinion or memorandum decision, either written or oral, find the facts and state its conclusions of law thereon in all actions tried without a jury, on every motion decided by a written order that is appealable as of right, and also as required by R[ule] 3:29. The court shall thereupon enter or direct the entry of the appropriate judgment.
>
> [R. 1:7-4(a).]

The court's decision on the motion to vacate judgment was concise and correct. As stated, the court did not abuse its discretion in granting the motion based on the moving certifications submitted. Moreover, plaintiff did not provide any contradictory evidence to refute defendant's contentions. Importantly, the court considered defendant's argument that there was a meritorious defense, which ultimately, defendant prevailed upon following trial. To hold otherwise would constitute a miscarriage of justice.

We decline to exercise original jurisdiction under <u>Rule</u> 2:10-5[4] because it would be futile. To reiterate, defendant presented a meritorious defense as detailed in Thomas's moving certification explaining he used "CGA as an independent contractor" and providing specific facts to support that claim, which were proven at trial.

IV.

Next, we address Alevras's argument that he was an employee of Thomas. Alevras maintains the court erroneously found, under the ABC test, that he was an independent contractor and not an employee. Alevras urges he was an employee of Thomas and therefore entitled to four weeks of vacation pay, the 200% penalty under the WPL, and reimbursement for the expenses stated.

The ABC test, referring to the three subparagraphs of N.J.S.A. 43:21-19(i)(6), is used to determine if a person is an employee or an independent contractor for purposes of the Unemployment Compensation Law (UCL), N.J.S.A. 43:21-1 to -24.30. However, our Supreme Court has adopted the same for the purposes of the WPL in <u>Hargrove</u>, 220 N.J. at 305. Under the ABC test,

---

[4] "The appellate court may exercise such original jurisdiction as is necessary to the complete determination of any matter on review." <u>R.</u> 2:10-5.

16

an individual is presumed to be an employee unless the employer satisfies each

sub-part of the test. Ibid. The statute provides as follows:

> Services performed by an individual for remuneration shall be deemed to be employment subject to this chapter ([N.J.S.A. 43:21-1 to -71]) unless and until it is shown to the satisfaction of the division that:
>
> > (A) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact; and
> >
> > (B) Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and
> >
> > (C) Such individual is customarily engaged in an independently established trade, occupation, profession or business.
>
> [N.J.S.A. 43:21-19(i)(6).]

In Hargrove, the Supreme Court explained the considerations under each

part of the test:

> In order to satisfy part A of the "ABC" test, the employer must show that it neither exercised control over the worker, nor had the ability to exercise control in terms of the completion of the work. In establishing control for purposes of part A of the test, it is not necessary that the employer control every aspect of the

17

worker's trade; rather, some level of control may be sufficient.

Part B of the statute requires the employer to show that the services provided were "either outside the usual course of the business . . . or that such service is performed outside of all the places of business of the enterprise." While the common law recognizes part B as a factor to consider, it is not outcome determinative within the confines of the "right to control" test.

Part C of the statute is also derived from the common law. This part of the test "calls for an enterprise that exists and can continue to exist independently of and apart from the particular service relationship. The enterprise must be one that is stable and lasting—one that will survive the termination of the relationship."

Therefore, part C of the "ABC" test is satisfied when an individual has a profession that will plainly persist despite the termination of the challenged relationship. When the relationship ends and the individual joins "the ranks of the unemployed," this element of the test is not satisfied.

[Hargrove, 220 N.J. at 305-06 (citations omitted).]

The terms of the contract are not controlling on the issue of whether the person is an independent contractor. Phila. Newspapers, Inc. v. Bd. of Review, 397 N.J. Super. 309, 321-22 (App. Div. 2007). This is a "fact-sensitive" analysis where the substance, not the form of the relationship, is reviewed. Carpet Remnant Warehouse, Inc. v. N.J. Dep't of Labor, 125 N.J. 567, 581-82 (1991).

18

A.

Here, under prong A, Alevras asserts it was not necessary for Thomas to control every aspect of his work; rather, some level of control may be sufficient. Schomp v. Fuller Brush Co., 124 N.J.L. 487, 491 (Sup. Ct. 1940). Alevras argues Thomas admitted that he would distribute a client file to him and direct the work he was to complete, creating a "collaborative effort" between them to produce a finished product. Therefore, he alleges Thomas monitored and controlled the work product. We disagree.

We are satisfied there was substantial credible evidence in the record to support the court's finding Thomas satisfied prong A. The court found it was "clear" that Thomas would ask Alevras "to either write briefs, or perform research," but Thomas did not assert such control over Alevras himself. Moreover, Thomas satisfied prong A because Alevras "had been" and will "continue to be free from control or direction over the performance of such service, both under his contract of service and in fact." N.J.S.A. 43:21-19(i)(6)(A). Unlike Schomp, the parties here never had a written contract and thus there is no evidence as to whether Alevras was free from Thomas's control as a matter of contract. 124 N.J.L. at 491.

19

The record supports the court's determination that Thomas neither exercised control over Alevras nor had the ability to in terms of completion of his paralegal work. Other than selecting the files Alevras would work on, there was no evidence Thomas or his law firm controlled or directed how Alevras was to perform the work. Just like the company in Carpet, Thomas only cared about the quality and result of Alevras's work. 125 N.J. at 591. Thomas testified he did not supervise Alevras and only made changes to his work product after it was completed. There is also no evidence in the record to show Thomas required Alevras to utilize Gann Law books for research. Further, Thomas and his law firm did not exercise any more control over Alevras as a paralegal than required by RPC 5.3(b): "A lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer."

Importantly, Alevras was not required to work set hours. Thomas had no control over the individuals Alevras utilized, such as his own employees, to write the briefs. Thomas never told Alevras he could not work for other attorneys or law firms. Carpet, 125 N.J. at 590. Additionally, Thomas did not provide Alevras with training supplies, equipment, uniforms, or fringe benefits. Trauma Nurses Inc. v. Bd. of Review, 242 N.J. Super. 135, 148 (App. Div.

20                                                                    A-0702-24

1990).  The uncontroverted evidence established Alevras was not a participant in Thomas's healthcare or retirement plans, which he provided for his employees.

Thomas also did not pay taxes or withholdings for Alevras as he did with his firm's W-2 employees.  Lastly, the court heavily relied on the email Thomas sent to Alevras, which confirmed he used CGA as an independent contractor, but CGA was not a "working affiliate" of his office, and therefore, it was "imperative" that their offices "remain as they have been, completely independent of each other."  We conclude Thomas met his burden of proving prong A.

### B.

Prong B under the ABC test is an alternative test.  The Hargrove Court held that an employee must show the services provided were "either outside the usual course of the business . . . or that such service is performed outside of all places of business of the enterprise."  220 N.J. at 305; N.J.S.A. 43:21-19(i)(6)(B).  The Carpet Court declined to define the term "usual course of the business" and held "the places of business of the enterprise" are limited to "only . . . those locations where the enterprise has a physical plant or conducts an integral part of its business."  125 N.J. at 592.

A-0702-24

Regarding prong B, Alevras maintains this prong is not outcome determinative but contends the work performed fell within the scope of Thomas's regular course of business and that Thomas never denied or contested such work. Alevras also contends he was a "physical occupant" of Thomas's office.

Based on the evidence presented, the court properly concluded "CGA was writing briefs and performing research," and those services "could have been performed anywhere." The record supports that determination, and we discern no basis to disturb the court's conclusion regarding prong B.

C.

As to prong C, the analysis "calls for an enterprise that exists and can continue to exist independently of and apart from the particular service relationship." Gilchrist v. Div. of Emp. Sec., 48 N.J. Super. 147, 158 (App. Div. 1957). The "enterprise must be one that is stable and lasting—one that will survive the termination of the relationship." Ibid. Stated another way, prong C is not satisfied "[w]hen the relationship ends and the individual can join 'the ranks of the unemployed.'" Hargrove, 220 N.J. at 306 (quoting Schomp, 124 N.J.L. at 491-92). The prong C standard "is satisfied when a person has a business, trade, occupation, or profession that will clearly continue despite

A-0702-24

termination of the challenged relationship." E. Bay Drywall, LLC v. Dep't. of Labor & Workforce Dev., 251 N.J. 477, 497 (2022).

A non-exhaustive list of the relevant factors to consider under prong C includes: "the duration and strength of the [workers'] businesses, the number of customers and their respective volume of business, the number of employees, and the extent of the [workers'] tools, equipment, vehicles, and similar resources," along with the amount of remuneration the workers received from the putative employer compared to other sources. Carpet, 125 N.J. at 593. Notably, our Supreme Court has acknowledged that "even wholly dependent employees may choose to work for more than one employer." E. Bay, 251 N.J. at 498.

Here, the court concluded there was credible evidence to find Thomas satisfied prong C. The court reasoned CGA "is in the trade of performing research and writing briefs." Further, it is apparent Alevras was "customarily engaged" in this independently established trade "at the time of rendering the service involved," and when his relationship with Thomas ended, Alevras did not join the ranks of the unemployed. Gilchrist, 48 N.J. Super. at 158. Alevras testified that he was working for "four or five attorneys" and maintained his own office for the purpose of "independent paralegal services" with "CGA" on the

door. Similar to the workers found to be independent contractors in Trauma Nurses, Alevras had to obtain educational and licensure requirements to perform his work, as he has a law degree and a paralegal certificate. 242 N.J. Super. at 148.

Our Supreme Court in Carpet points to other factors indicative of satisfying prong C, such as the individual's ability to maintain an independent business, the duration and strength of its business, the number of customers and their respective volume of business, the number of employees, and the extent of the installers' tools, equipment, vehicles, and similar resources. 125 N.J at 593.

Here, Alevras had a legal business name, "CGA Associates," which had its own office, and retained several employees, including part-time secretaries that he paid from his business account. CGA had its own phone line, which was listed on its business card, and its own bank account. Alevras used his own computer and printer and had a space within his office where his secretaries would work. Alevras also testified his work for attorneys "was based on a job-specific task," and our courts have found that workers that are paid per job, rather than by the hour, are more likely to be an independent contractor. See Mavrikidis v. Petullo, 153 N.J. 117, 132 (1998). Accordingly, the court did not err in finding Thomas met his burden on prong C.

To the extent we have not addressed them, any remaining arguments raised by plaintiff lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division