# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-1798-24
     A-1799-24

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

  Plaintiff-Respondent,

v.

N.M. and J.F.,

  Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF J.F. and
M.F., minors.

_____

    Submitted March 24, 2026 – Decided April 14, 2026

    Before Judges Chase and Augostini.

    On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FG-12-0043-24.

Jennifer N. Sellitti, Public Defender, attorney for appellant N.M. (Carol L. Widemon, Designated Counsel, on the briefs).

Jennifer N. Sellitti, Public Defender, attorney for appellant J.F. (Laura M. Kalik, Designated Counsel, on the briefs).

Jennifer Davenport, Attorney General, attorney for respondent (Christopher Weber, Assistant Attorney General, of counsel; Julie B. Colonna, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minors J.F. and M.F. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Amelia K. Biramian, Designated Counsel, on the brief).

PER CURIAM

In these consolidated appeals, defendants J.F. ("Jeff") and N.M. ("Nan"), the biological parents of J.F. ("Joe") and M.F. ("Maya"),[1] appeal from a January 30, 2025 order terminating their parental rights to Joe and a March 27, 2025 order denying their motion to vacate their identified surrender of Maya. Jeff and Nan argue the Division of Child Protection and Permanency ("DCPP") did not meet all four prongs of N.J.S.A. 30:4C-15 for termination of their parental rights to Joe and that they did not surrender their parental rights to Maya

---

[1] We use initials and pseudonyms to protect the privacy of the family. R. 1:38-3(d)(12).

knowingly and voluntarily. DCPP and the Law Guardian contend the judgment is supported by substantial credible evidence in the record. Additionally, they assert the court did not abuse its discretion in denying Jeff and Nan's motion to vacate their identified surrender of Maya. Having reviewed the record in light of the parties' contentions and the applicable law, we affirm.

I.

Jeff and Nan had two children together, Joe, born in May 2020, and Maya, born in January 2023; both of whom were born with benzodiazepine and methadone in their systems, causing DCPP to be alerted.

Within days after Joe's birth, DCPP assisted Jeff and Nan in creating a Safety Protection Plan ("SPP"), requiring both parents to be under supervision when they were with Joe due to both Jeff and Nan's substance abuse. In July, DCPP took immediate custody of Joe because Jeff and Nan violated the SPP and had ongoing substance abuse issues. Nine months later, the parents' case was dismissed, although Jeff was still required to be under supervision with Joe until he successfully completed a substance abuse program.

In June 2022, DCPP received a referral claiming that when Jeff was drunk, he hit Nan and left taking two-year old Joe with him. Joe was located by police and returned to Nan. At that time, Nan reported to DCPP that Jeff punched her

in the face multiple times and strangled her when Joe was present. Six months later, DCPP received another referral based on alleged domestic violence between Jeff and Nan. Jeff's brother intervened in that domestic violence and he and his brother allegedly threatened to stab each other with screwdrivers. Joe was present during this altercation.

In January 2023, Maya was born. Due to the substance abuse by Nan, Maya was born drug addicted and with serious medical issues, causing her to need numerous surgeries, eat through a feeding tube, and be kept in the hospital for six months. During Maya's hospital stay, her paternal uncle and aunt, Mr. and Ms. F., visited regularly; comforting Maya and attending training related to her medical needs. Jeff and Nan did not visit consistently and would show up late to agreed upon visits. When Maya was finally released, she was placed with Mr. and Ms. F.

On January 13, 2023, DCPP caseworkers implemented another SPP, to which Jeff and Nan consented. Caseworkers also discussed a visitation plan in which maternal grandmother, M.M., and paternal grandmother, K.F., would supervise Jeff and Nan's visits with their children. Within a week, Jeff and Nan did not comply with the supervision. As such, K.F. and M.M. informed DCPP that they no longer wanted to supervise Jeff and Nan's visits. As a result, DCPP

4

completed an emergency removal of Joe. Days later, the court granted custody, care, and supervision of both children to DCPP. Joe was placed in the care of Mr. and Ms. F., where he remained until September 2023.

On March 29, 2023, the court ordered Jeff and Nan to comply with substance abuse treatment, a psychological evaluation, and to submit to random drug and alcohol screenings. However, Jeff did not complete treatment as he was arrested and incarcerated for assaulting Nan. As a result of the assault, Nan was admitted to the hospital for near-fatal wounds to her cheek and thighs. Nan denied that Jeff stabbed her, claiming instead that she was robbed while attempting to buy drugs. Jeff remained incarcerated for this incident until August 2023 when the matter was dismissed. DCPP arranged video visits with him and Joe during this time.

On July 6, 2023, a Title 30 Summary Hearing was held. The court referred Nan to substance abuse treatment, psychological evaluation, methadone treatment, and to speak with the domestic violence liaison. Jeff was referred to a psychological evaluation and required to comply with recovery court from another arrest. After his incarceration, he was admitted to Straight and Narrow's long-term substance abuse program.

A-1798-24

In September 2023, Joe was transferred to an unrelated resource home. Mr. and Ms. F. requested Joe's removal as it was too challenging to manage Joe's behavioral issues while managing Maya's complex medical needs. Joe remained in the resource home for several months, but he had difficulty adjusting and exhibited numerous behavioral issues such as screaming and hitting himself and others. The unrelated resource home parent eventually requested Joe to be removed from the home.

On October 5, 2023, Jeff attended a psychological evaluation in which Dr. Winston found that Jeff presented numerous factors that impaired his ability to safely parent children such as opioid use, anger issues, and emotional difficulties. Dr. Winston recommended that Jeff continue supervised visitation, complete his substance abuse treatment at Straight and Narrow, then attend an intensive outpatient ("IOP") level substance abuse program, engage in individual therapy, complete a parenting skills course, complete batterer's intervention, and attend couples counseling.

On November 14, 2023, Jeff left the Straight and Narrow program contrary to clinical advice allegedly to obtain a second opinion from a doctor on his hand injury. Two days later, on November 16, 2023, Jeff was arrested and

A-1798-24

incarcerated. In December 2023, Nan had been attending a substance abuse program for three days but also left against clinical advice.

On December 21, 2023, the court held a permanency hearing accepting DCPP's plan to terminate Nan and Jeff's parental rights and begin the process of adoption for both children. In February 2024, Joe was transferred to Joe's paternal aunt, Ms. K. and her husband, Mr. K.'s care. In their care, Joe engaged in weekly therapy, and many of his behavioral concerns improved with their support.

DCPP re-referred both Nan and Jeff for psychological and bonding evaluations. After some delays, Nan eventually attended this evaluation in May 2024. In Nan's psychological evaluation, Dr. Winston diagnosed Nan with severe opioid disorder, bipolar I disorder, domestic violence, and a pain disorder. Nan's failure to address her mental health and substance abuse issues was found to impair her ability to safely parent her children. Nan was found to have a high risk of relapse, and it was recommended that she participate in a long-term residential substance abuse treatment program followed by an intensive outpatient treatment program, intensive counseling, and domestic violence treatment. Dr. Winston further recommended that Nan should exhibit a sustained period of sobriety, specifically, a minimum period of eighteen

months, before restrictions on her contact with her children are lifted. Lastly, Dr. Winston concluded that Nan demonstrated no awareness of the negative impact that her abusive relationship with Jeff posed to the children or herself.

For Jeff's psychological evaluations, despite DCPP's arranging psychological and bonding evaluations at the courthouse in lieu of jail, Jeff refused to be produced for court twice and missed each evaluation. Jeff was incarcerated at various facilities throughout litigation, which restricted his ability for his children to visit him until he was placed in Bayside State Prison in April 2024. Once at Bayside, DCPP transported the children twice a month for visitation.

When Jeff was finally evaluated, Dr. Winston diagnosed him with antisocial personality disorder, an unspecified anxiety disorder, severe opioid use disorder, and moderate cocaine use disorder. She noted that in the year between her meetings with him, Jeff had failed to make any progress in his substance abuse treatment, mental health treatment, and domestic violence counseling.

After Nan completed a short-term residential program in April 2024, she was recommended to complete a twenty-eight-day program but failed to comply. In July 2024, Nan received methadone maintenance and was enrolled in a

A-1798-24

substance abuse program at South Amboy Health Center; yet she continued to test positive for a variety of illicit substances including fentanyl and cocaine. Nan was discharged from IOP due to noncompliance and was recommended for a higher level of treatment but refused. In August 2024, Nan attended Central Jersey Comprehensive Treatment Center where she was supposed to receive substance abuse treatment, mental health treatment, and medication management. However, as of October 14, 2024, Nan had missed fifteen doses of her methadone treatment and had not yet begun an IOP level substance abuse program. On November 8, 2024, it was reported that Nan had made minimal progress in treatment, had missed an additional sixteen days of methadone treatment, and Nan's only urine sample came back positive for illicit opiates, benzodiazepines, cocaine, and fentanyl. In December 2024, Nan entered into an inpatient treatment in a Mommy and Me substance abuse treatment program at Straight and Narrow, where she stayed throughout the proceedings.

In August 2024, Jeff was released from probation to a halfway house and attended some visits with Joe. DCPP re-referred him for services, but he did not comply. In September 2024, Jeff tested positive for cocaine, marijuana, and suboxone and was recommended for a higher level of care. However, later that month, Jeff was reincarcerated after violating the terms of his parole by

A-1798-24

relapsing, providing a positive drug screen, and absconding from his halfway house to live with Nan. In October, he was transferred to prison, where he remained until December 2024.

The parties presented their cases over four non-consecutive trial days before the Family Part judge. On the first day of trial, Jeff and Nan voluntarily surrendered their parental rights to Maya and the trial proceeded concerning their parental rights as to Joe only. Four different witnesses testified: Ike Eze, DCPP case worker assigned to the case; Ms. K., one of Joe's current guardians requesting to adopt; Dr. Alison Strasser Winston, the psychologist who evaluated both parties and their interactions with Joe; and Jeff on his own behalf.

Caseworker Eze testified regarding all of the events that had taken place surrounding Nan, Jeff, Joe, and Maya and provided the timeline of facts in the case. Eze described Jeff and Nan's noncompliance with DCPP's numerous efforts to assist them with their substance abuse, mental health, and medical treatment as well as their respective noncompliance.

Ms. K. testified to Joe's behavior and her desire to legally adopt Joe rather than continue Kinship Legal Guardianship ("KLG"). She expressed that although Joe initially had been a challenge, she has seen great improvement in his behavior after giving him a consistent routine and regular in-home therapy.

A-1798-24

She argued that adoption was better for Joe than KLG because he "runs on consistency and stability" and raising him without interruptions would continue to improve his behavior.

DCPP called Dr. Winston to testify, as she had completed psychological evaluations of Jeff and Nan and bonding evaluations between Joe and Jeff; Joe and Nan; and Joe and Mr. and Ms. K. Dr. Winston concluded that it was in the best interests of Joe to have Jeff and Nan's parental rights terminated so that he could be legally adopted by Mr. and Ms. K. This was supported by the fact that neither parent made any progress to address their substance abuse or mental health diagnosis and that in her bonding evaluations, Joe was found to have an insecure attachment to Jeff and Nan, and had a secure attachment to Mr. and Ms. K.

Finally, Jeff testified on his own behalf, explaining that he had a new-found goal to get Joe back, he believed he would complete a substance abuse program in the future, and noted that his visits with Joe have been largely positive.

On January 30, 2025, the trial court found that DCPP had met the four prongs of N.J.S.A. 30:4C-15, terminating Jeff and Nan's parental rights to Joe.

11

On March 27, 2025, the court denied Jeff and Nan's motions to vacate their identified surrender of Maya. This appeal followed.

## II.

"Our scope of review on appeals from orders terminating parental rights is limited." N.J. Div. of Child Prot. & Permanency v. M.M., 459 N.J. Super. 246, 256 (App. Div. 2019). "We review the trial court's factual findings in accordance with a deferential standard," N.J. Div. of Child Prot. & Permanency v. D.C.A., 256 N.J. 4, 19 (2023), and its findings "generally should be upheld so long as they are supported by 'adequate, substantial, and credible evidence.'" M.M., 459 N.J. Super. at 256 (quoting N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014)). "We accord deference to fact[-]findings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012). "[A] trial court's factual findings 'should not be disturbed unless they are so wholly unsupportable as to result in a denial of justice.'" N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)).

III.

To decide whether to terminate parental rights, a trial judge considers the four-prong best interests test:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The [DCPP] has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

DCPP must prove the four prongs by "clear and convincing" evidence. N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 611-12 (1986). The prongs "are not discrete and separate; they . . . overlap . . . to . . . comprehensive[ly] . . . identif[y] a child's best interests." In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999). These considerations are fact-sensitive and require particularized evidence addressing the specific circumstances. Ibid.

A-1798-24

## A.

To satisfy the first prong of N.J.S.A. 30:4C-15, there must be evidence that the parent caused the child harm. In re Guardianship of K.H.O., 161 N.J. at 348-49. While one single harm may be sufficient, "the focus is on the effect of harms arising from the parent-child relationship over time on the child's health and development." Id. at 348. "In order to satisfy this prong," DCPP "need not 'wait until a child is actually irreparably impaired by parental inattention or neglect[,]'" but must only "demonstrate that the parental relationship has created a harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" N.J. Div. of Youth & Fam. Servs. v. L.M., 430 N.J. Super. 428, 444 (App. Div. 2013) (quoting F.M., at 449).

We fully accept that "[d]rug rehabilitation does not generally progress without incident[,]" N.J. Div. of Youth & Family Servs. v. V.T., 423 N.J. Super. 320, 330 (App. Div. 2011) (internal citation omitted), but that does not change the fact that "[a] parent's withdrawal of [their] solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." In Re Guardianship of DMH., 161 N.J. 365, 379 (1999). In deciding whether a parent can continue the parental relationship

14                                                          A-1798-24

without recurrent harm to the child, the court can consider past behaviors. J. v. M., 157 N.J. Super. 478, 493 (App. Div. 1978).

We are unpersuaded by Nan's claim that the court relied on her substance abuse alone as well as Jeff's claim that the court considered his incarceration alone to find that DCPP met prong one. These arguments are belied by the record, which shows that the court relied on numerous factors in which Nan and Jeff's actions led to Joe's harm including, their lack of effort in remediating their substance abuse, mental health, and domestic violence concerns that professionals had provided them with resources and recommendations to address. Jeff and Nan were consistently referred to these programs and yet both parents consistently chose not to complete any program recommended to them, rendering them unable to have unsupervised time with Joe and ultimately causing Joe serious behavioral issues due to this lack of stability.

Joe's behavioral issues are substantive proof that Joe was harmed by his parents' choices not to correct their substance abuse. These serious issues led to Mr. and Ms. F.'s inability to care for Joe while caring for his sister and a subsequent removal from another foster home. These behavioral issues were mitigated over time through the consistent and predictable care and stable routine Joe received from Mr. and Ms. K. Due to the lack of stability and

15

permanence caused by his parents, Joe also had attachment issues and concern for his own safety and stability, as was shown by his frequently verbalized worries about where he would live, his constant pursuit of reassurance from caregivers, and his no longer wanting to sleep independently. Jeff and Nan's claim that Joe was not harmed by their actions is not supported by the record.

B.

Prong two requires there be parental unfitness, which can "be demonstrated [if] the parent is 'unwilling or unable to eliminate the harm' that has endangered the child's health and development" or "if the parent has failed to provide a 'safe and stable home for the child' and a 'delay in permanent placement' will further harm the child." K.H.O., 161 N.J. at 352 (quoting N.J.S.A. 30:4C-15.1(a)(2)). While prongs one and two are separate inquiries, they are related and "evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child." DMH., 161 N.J. at 379. Courts must assess: (1) whether parents have and are able to sufficiently ameliorate the risk of harm; and (2) if unremedied, whether the delay needed to address and lessen that risk will cause additional harm to the children. K.H.O., 161 N.J. at 348.

This prong focuses on the steps taken by the parents to maintain their relationship with the child and to foster an environment leading to healthy, normal child development. Id. at 352. Included in this analysis is whether the delay of permanent placement will add to the harm suffered by the child. Id. at 348. Permanency is favored over extended reunification efforts, as "[t]he trend over the last thirty years has been toward foster care reforms that place limits on the amount of time a parent may have to correct conditions at home in anticipation of reunification." N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 116 (App. Div. 2004) (quoting K.H.O., 161 N.J. at 357-58). "[P]lacement plans must not lose sight of time from the perspective of the child's needs." K.H.O., 161 N.J. at 357. The second prong can be satisfied with a showing that the child will suffer substantially from a lack of stability and a permanent placement. N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 281 (2007).

We are also unconvinced by Jeff and Nan's claims that DCPP did not meet prong two. Jeff's claims that the court did not consider his positive interactions with Joe or his several attempts to start substance abuse programs are contradicted by the record. The court considered Jeff's interactions with Joe; however, since these interactions showed Joe's insecure attachment to Jeff, they

A-1798-24

did not support his quest for reunification. The court also considered Jeff's beginning numerous substance abuse programs, but since he failed to complete any one of them, this also attributed to his parental unfitness.

Nan's argument that her lack of completion of substance abuse programs and missed visits with Joe were caused by financial instability is not supported by the record. Nan never informed anyone that she did not have access to a phone. Moreover, transportation to visits with Joe was paid for by DCPP, and medical staff offered to help her with her subsidized housing so that she could stay in substance abuse programs but she refused.

Based on our review of the record, we are convinced the court correctly applied the second prong in finding that Jeff and Nan demonstrated unremedied parental unfitness. The record shows that Jeff and Nan were made fully aware that they had to fix their circumstances to regain the ability to be with their son unsupervised once again; they were referred to numerous programs; and they both failed to complete any long-term treatment. Jeff and Nan made little to no progress throughout the two-year period that they should have been attempting to regain the ability to parent their son, and this is unlikely to change.

The record supports the court's finding that a further delay in permanent placement would be harmful to Joe. As Ms. K. explained, Joe "runs on

A-1798-24

consistency and stability", and due to the routine, that she has had with him for the past few months, she's seen great improvement in his behavioral issues. Dr. Winston made clear that it would be very harmful to Joe if his parents maintained sobriety for some time but then relapsed and he had to be removed from again and experience further instability. Meanwhile, Dr. Winston has found relapse to be very likely.

C.

Under prong three, DCPP's efforts must be analyzed "with reference to the circumstances of the individual case[,]" including the parent's degree of participation. In re Guardianship of DMH, 161 N.J. at 390. N.J.S.A. 30:4C-15.1(c) defines reasonable efforts as those reasonable "attempts by an agency authorized by [DCPP] to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure . . . ." The statute sets forth examples of "reasonable efforts," including but not limited to:

> (1) consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;

A-1798-24

(3) informing the parent at appropriate intervals of the child's progress, development, and health; and

(4) facilitating appropriate visitation.

[Ibid.]

Jeff and Nan's claims that DCPP did not provide them with reasonable attempts to remedy their substance abuse, domestic violence, and mental health concerns that led to their initial loss of custody are without merit. The record provides ample evidence that DCPP referred both Jeff and Nan to several substance abuse programs, domestic violence programs, and helped both Jeff and Nan in organizing visitations with Joe–even while Jeff was incarcerated–as well paying for their transportation to these visits. Despite all these referrals and assistance, Jeff and Nan generally did not attend any programs and Nan continuously missed visitation with Joe.

Jeff and Nan's claim that the court did not consider alternatives to parental rights is also contradicted by the record. The court explicitly mentioned that KLG was not in the best interests of Joe, rather, terminating parental rights followed by adoption was in Joe's best interests, as it would give him more permanence and stability. The possibility of a continued KLG arrangement was discussed in testimony at trial, the court heard Ms. K. and DCPP's thoughts on how KLG would affect Joe, and agreed with these parties' claims over Jeff and

20

Nan's. The record supports the trial court's legal conclusions that DCPP met this prong.

D.

"[T]he fourth prong 'serves as a fail-safe against termination even where the remaining standards have been met.'" R.G., 217 N.J. at 559 (quoting N.J. Div of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 108 (2008)). "The question is . . . 'not whether a biological mother or father is a worthy parent, but whether a child's interests will best be served by completely terminating the child's relationship with that parent.'" Ibid. (quoting E.P., 196 N.J. at 108). "[A] child's need for permanency is an extremely important consideration pursuant to this prong." Ibid. This analysis "cannot require a showing that no harm will befall the child as a result of the severing of biological ties." K.H.O., 161 N.J. at 355.

"If a child can be returned to the parental home without endangering [their] health and safety, the parent's right to reunification takes precedence over the permanency plan." N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 491-92 (App. Div. 2012) (citing N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 607-09 (1986)). However, children should not "languish indefinitely" in a resource placement while a parent attempts to correct parenting difficulties. N.J. Div. of Youth & Fam. Servs. v. S.F., 392 N.J. Super. 201, 209

A-1798-24

(App. Div. 2007). Termination is necessary under certain circumstances to allow children to have a secure and permanent home. See N.J. Div. of Youth & Fam. Servs. v. B.G.S., 291 N.J. Super. 582, 595 (App. Div. 1996) (holding that the "termination action was not predicated upon bonding but rather reflected [the child's] need for permanency and [the defendant's] inability to care for him in the foreseeable future").

Based on our review of the record, we are convinced that the court correctly applied prong four finding that terminating parental rights would not do more harm than good. Despite Jeff and Nan's claims that they had positive relationships with Joe, these relationships were deemed as "insecure attachment[s]" and Jeff's were always supervised. Meanwhile, Joe already had a relationship with his guardians Mr. and Ms. K., that was deemed to be secure. Dr. Winston testified that any harm caused to Joe by terminating Jeff and Nan's parental rights would likely be remedied by the strength of his secure attachment to Mr. and Ms. K.

Upon hearing testimony regarding the numerous times Jeff and Nan acted unreliably, inconsistently, and did not manage their substance abuse; combined with Dr. Winston's observations regarding Joe's attachment to Jeff and Nan as

22

compared with Mr. and Ms. K.; the court's finding that DCPP proved prong four by clear and convincing evidence is amply supported by the record.

IV.

We are also unpersuaded by Jeff and Nan's arguments that they did not surrender their parental rights to Maya knowingly and voluntarily. Thus, the court did not abuse its discretion in refusing to vacate the identified surrender.

Rule 4:50-1 "is applicable to consensual final judgments," N.J. Div. of Youth & Family Servs. v. T.G., 414 N.J. Super. 423, 434, (App. Div.) certif. denied, 205 N.J. 14 (2010), and is appropriate where a claimant seeks to vacate a judgment terminating parental rights. In re Guardianship of J.N.H., 172 N.J. 440, 474 (2002). Relief under this rule is "granted sparingly." F.B. v. A.L.G., 176 N.J. 201, 207 (2003).

A trial court's denial of a motion to vacate is "a determination left to the sound discretion of the trial court, guided by principles of equity." Ibid. Therefore, its "judgment will be left undisturbed 'unless it represents a clear abuse of discretion[,]'" ibid.; (quoting Hous. Auth. of Morristown v. Little, 135 N.J. 274, 283 (1994)), meaning its findings were "so wide of the mark that a mistake must have been made." M.M., 189 N.J. at 279 (quoting Pioneer Nat'l

Title Ins. Co. v. Lucas, 155 N.J. Super. 332, 338 (App. Div. 1978), aff'd, 78 N.J. 320 (1978)).

Once a parent completes an identified surrender and a guardianship judgment is entered, any request to re-establish the child's relationship with his or her parent requires a court to focus on the child's best interests because it is "the future of a child [that] is at stake." T.G., 414 N.J. Super. at 434 (quoting, 172 N.J. at 474-75). For that reason, parents seeking to vacate a judgment of guardianship must establish a change in circumstances and prove that vacating the judgment would be in the child's best interests. Id. at 434-35. In order to establish changed circumstances, a parent must prove "that events have occurred subsequent to the entry of a judgment that, absent the relief requested, will result in 'extreme' and 'unexpected' hardship." J.N.H., 172 N.J. at 473 (quoting Little, 135 N.J. at 285-86). Proof of any grounds set forth in Rule 4:50-1 satisfies this requirement. T.G., 414 N.J. Super. at 435.

As to proof that vacating the judgment would be in the best interests of the child, such proof must be "clear and convincing." See N.J. Div. of Youth & Family Servs. v. L.L., 201 N.J. 210, 225 (2010). "This prong requires a weighing of the effects setting aside the judgment may have on the child's stability and permanency." T.G., 414 N.J. Super. at 435.

When they executed the voluntary surrender, Jeff and Nan told the court that they understood the form they completed and signed to be a termination of parental rights document; acknowledged that they made the decision voluntarily and of their own free will; denied being under the influence of any prescribed medication or drug that would affect their ability to make this decision; they were aware that they were entitled to counseling by DCPP and waived that right; and they acknowledged that they had sufficient time to contemplate their decision as well as receive advice from their attorneys. Meanwhile, both parties made these promises under oath to the court. Thus, the parties' efforts to claim that they did not have enough time to speak with their attorney, that they did not understand, and that they were potentially under the influence of substances is belied by the record.

Neither party experienced a change in circumstances proving that a vacatur of judgment is in Joe's best interests. Jeff's argument that he has changed his mind is unconvincing and is not enough to prove that his circumstances have changed. Nan's argument that her participation in Straight and Narrow's program should constitute a change is circumstances is insufficient to show that vacating judgment is in Joe's best interests, especially when Nan had two years prior to complete this program.

A-1798-24

To the extent we have not addressed any arguments raised by Jeff or Nan, they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(A) and (E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-1798-24